IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:09-CV-2455 -L** |
| | § | Consolidated with 3:11-CV-1038 -L |
| **MORRIS DAVENPORT, CYNTHIA** | § | |
| **DAVENPORT, DAVID DAVENPORT,** | § | |
| **and MYRA DAVENPORT,** | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is the United States' Motion for Summary Judgment, filed November 18, 2011; and Defendants' Motion for Partial Summary Judgment, filed November 18, 2011.  After carefully considering the motions, responses, briefs, replies, appendices, evidence, record, and applicable law, the court **grants** the United States' Motion for Summary Judgment and **denies** Defendants' Motion for Partial Summary Judgment.

## I.    Factual and Procedural Background

On December 28, 2009, the United States of America ("the Government") filed this action seeking to recover erroneously issued refunds of taxes paid to Morris and Cynthia Davenport and to David and Myra Davenport (collectively, "the Davenports") for the 2003 tax year.[1]  The Government seeks to recover a total of $292,095.70 in erroneously issued refunds ($112,399 issued to David and Myra Davenport, and $112,398 issued to Morris and Cynthia Davenport) plus

---

[1] The court recognizes that both parties have asserted claims in this action and, thus, both are plaintiffs and defendants; however, to avoid confusion, the court will refer to the Government as "Pl." and the Davenports as "Defs." for purposes of citing to the parties' pleadings, briefing, and evidence.

**Memorandum Opinion and Order – Page 1**

additional allowable interest on the refunds pursuant to 26 U.S.C. §§ 6602, 6621 and 28 U.S.C. § 1961(c)(1).  The Government also contends that it is entitled to a ten percent surcharge under 28 U.S.C. § 3011 for its efforts in recovering the refund or debt, as well as interest allowable by law.

On May 18, 2011, the Davenports brought a related action against the Government, Case No. 3:11-CV-1038-L, seeking a refund pursuant to section 41 of the Internal Revenue Code for certain qualified research tax credits that they claim the Internal Revenue Service ("IRS") wrongfully disallowed for the 2002 tax year.  Morris and Cynthia Davenport seek a refund of $98,449, and David and Myra Davenport seek a refund of $98,449.  In addition, the Davenports seek interest, costs, and attorney's fees allowable by law.

On June 3, 2011, the Government and the Davenports filed a joint motion to consolidate the two actions on the grounds that:

> [t]he issues to be resolved in this lawsuit and the second-filed lawsuit are the same whether Burly Corporation was entitled to a tax credit under 26 U.S.C.§41 of the Internal Revenue Code. The only difference is that this lawsuit involves tax year 2003 and the second-filed lawsuit involves tax year 2002. The credit for increasing research activities that Burly Corporation claimed for tax years 2002 and 2003 was based on the same project and involves the same witnesses and many of the same documents. Because this lawsuit and the second-filed lawsuit involve common questions of law and fact, the Court should transfer the second-filed lawsuit to this Court and consolidate it with this lawsuit to prevent the parties from incurring the unnecessary cost associated with duplicative discovery and trials.

Jt. Mot. 3 (Doc. 28).  By order dated June 8, 2011, the two actions were consolidated.

Morris Davenport and David Davenport are 50 percent shareholders in Burly Corporation ("Burly").  Burly manufactures residential metal roofing and stand-alone metal buildings through its subsidiary, Mueller Supply Company Inc. ("Mueller"), which was purchased by the Davenport family in 1984.  On September 8, 2006, and October 14, 2006, the Davenports filed amended tax

returns for the 2002 and 2003 tax years in which they claimed tax credits for expenses incurred in 2002 and 2003 in conjunction with software developed to manage, automate, and integrate all aspects of Mueller's business, including automation and integration of manufacturing, design, sales, accounting, and shipping.  The Davenports refer to this undertaking as the OneWorld Project and the resulting software system that was developed for use by Mueller as the OneWorld system ("Mueller OneWorld System").  The Governments' refund claim is based on tax credits claimed by the Davenports for 2003 in conjunction with the OneWorld Project.

The Government rejected the research credits claimed by the Davenports for the 2002 tax year and claims to have erroneously refunded the amounts claimed by the Davenports for the 2003 tax year because no audit was performed in processing the Davenports' 2003 claims.  As explained herein, the Davenports contend that the Government's refund claim as to David and Myra Davenport is untimely.  It is undisputed that the IRS mailed a refund check for the 2003 tax year to David and Myra Davenport on December 28, 2007.  The refund check to Morris and Cynthia Davenport for the 2003 tax year was mailed on June 27, 2008.

The Government generally contends that the OneWorld Project involved mere adaptation of existing commercially available software and quality control type testing, whereas the Davenports maintain that the Project involved a complex process of custom software design, customization, testing, and implementation. It is undisputed that the Mueller OneWorld System was created using a J.D. Edwards OneWorld software application suite ("JDE OneWorld") that is commercially available and used for enterprise resource planning and has a number of modules for finance, accounting, manufacturing, distribution, human resources, and other applications.  Pl.'s App. 3.

It is also undisputed that Mueller purchased a license from International Business Machines ("IBM") for an ERP Bridge. According to IBM corporate representative Neal Horner ("Horner"), the ERP Bridge is data collection software that consists of base code developed for all of IBM's customers that is used as a starting point and customized to meet a particular customer's needs. *Id.* 10, 11, 30. Among other things, the ERP Bridge is used to interface with the JDE OneWorld system and run the terminals and wireless devices that are nonspecific to any particular customer. *Id.* 28. By "customization," Horner meant changing code or "writing computer programs" from scratch. *Id.* 25, 31. "Configuration," on the other hand, referred to selecting what is already there and filling in options without changing the computer code or instructions. *Id.* 25.

After filing 1120S tax forms for 2002 and 2003, the Davenports contracted with alliantgroup L.P. ("alliantgroup") on March 17, 2006, to perform "Research and Development Tax Credit Services" and a study to determine if Burly was eligible for qualified research tax credits.[2] *Id.* 295-99. Based on the advice of alliantgroup, the Davenports filed amended tax returns for 2002 and 2003 to claim credits for "in-house research" and "contract research" expenses under 26 U.S.C. § 41(b). Defs.' Compl. 1, ¶ 15. The Government contends, and the Davenports appear to agree, that the tax credits claimed by the Davenports for 2002 and 2003 are limited to wages paid to Mueller employees and outside contract employees, who assisted in developing the Mueller OneWorld System, but do not include expenses related to any services performed by IBM or J.D. Edwards consultants. *See* Pl.'s Mot. 4 (citing the deposition testimony of Mueller employee and Burly officer Phillip Arp ("Arp") at Pl.'s App. 44-46, 53); Defs.' Mot. 7 (citing Arp deposition at Defs.' App. 3). According to Arp, only expenses for the four contractors listed in deposition exhibit 165 (Pl.'s App. 357-58)

_____

[2] Alliantgroup is also acting as the Davenports' counsel in this action.

**Memorandum Opinion and Order – Page 4**

were included in the credits claimed by the Davenports.  These contractors include Steve Wilburn,

Tracy Leaks, Ronald Hartin, and Shannon Bailey, who all worked on the OneWorld Project.

On November 18, 2011, the Government moved for summary judgment on its 2003 refund

claim and the Davenports' claims for 2002 tax credits that were allegedly wrongfully disallowed.

The Davenports also moved for partial summary judgment regarding the legal standards that apply

to the parties' claims.  On January 26, 2012, pursuant to the court's request, both parties submitted

additional briefing and evidence in conjunction with the summary judgment motions regarding: (1)

whether a refund was paid to the Davenports for the 2003 tax year; (2) the amount of the refund paid;

and (3) whether the Government's refund action was timely.  On January 31, 2012, the court vacated

the parties' February 2012 pretrial deadlines and the March 2012 trial setting, pending resolution of

the summary judgment motions.

## II.     Motion for Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute

as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas

Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine"

if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary

judgment, the court is required to view all facts and inferences in the light most favorable to the

nonmoving party and resolve all disputed facts in favor of the nonmoving party.  *Boudreaux v. Swift

Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  Further, a court "may not make credibility

determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original).  "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'"  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586 (citation omitted).  Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment.  *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).  Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence.  *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim.  *Ragas*, 136 F.3d at 458.  Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment.  *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992).  "Only disputes over facts that might affect the outcome of the suit under the governing laws

will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  Disputed fact

issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary

judgment motion.  *Id.*  If the nonmoving party fails to make a showing sufficient to establish the

existence of an element essential to its case and on which it will bear the burden of proof at trial,

summary judgment must be granted.  *Celotex*, 477 U.S. at 322-23.

III.    **The Government's Motion for Summary Judgment on Both Parties' Claims**

The court first turns to the Government's summary judgment motion since it addresses both

parties' claims. The Government moved for summary judgment on (1) its cause of action to recover

the refunds erroneously issued by the IRS for qualified research tax credits claimed by the

Davenports in the 2003 tax year; and (2) the Davenports' claim that the IRS wrongfully disallowed

their claimed qualified research tax credits for the 2002 tax year.

A.    **The Parties' Contentions as to Whether the OneWorld Software Project Constitutes Qualified Research**

The Government contends that the Davenports are not entitled to qualified research tax

credits for the 2002 and 2003 tax years because the activities performed in conjunction with the

customization and configuration of the J.D. Edwards OneWorld software package do not constitute

qualified research.  The Government asserts a number of arguments, any number of which, according

to the Government, is dispositive of the issue of whether the activities at issue constitute qualified

research.  The Government first asserts that these activities and related expenditures are not qualified

research or qualified research expenditures because the activities fail to satisfy the requirements of

section 41(d) of the Internal Revenue Code under the section 174 test, the technological information

test, and process of experimentation test.  The Government also argues that the activities and

expenses claimed by the Davenports fall within section 41(d)(4)(E)'s exemptions for internal use software and section 41(d)(4)(A)-(C)'s exclusions for research done after commercial production of a business component; adaptation of existing business components; duplication of existing business components; and routine testing or inspection for quality control.   In addition, the Government contends that because the Davenports have failed to produce any agreements, the contract expenses claimed are not qualified research under section 1.14-2 of title 26 of the Code of Federal Regulations, which provides that "[a]n expense is paid or incurred for the performance of qualified research only to the extent that it is paid or incurred pursuant to an agreement that-- (I) Is entered into prior to the performance of the qualified research."

Finally, the Government asserts that even if the activities at issue constitute qualified research, the Davenports are still not entitled to credit because they used the wrong fixed-base percentage to calculate the tax credits.   According to the Government, a fixed-based percentage of three percent applies in calculating the amount of research credits the Davenports are entitled to for 2002 and 2003, because Burly is a start-up company.   The Government asserts that if a three percent fixed-based rate is applied in calculating the applicable base amount, the Davenports are not entitled to credit for 2002 or 2003.

The Davenports counter that the Government has mischaracterized the evidence and has not met its summary judgment burden on its refund claim.   The Davenports contend that the Government's motion attempts to shift to them the burden of proving the Government's 2002 refund claim.   Defs.' Resp. 3.   With regard to their wrongful disallowance claim for the 2003 tax year, the Davenports maintain that the Government is attempting to obtain summary judgment through an impermissible no evidence motion without satisfying its initial burden as the movant of establishing

that there is no genuine issue of material fact.[3]   Defs.' Resp. 4.   Even assuming that the Government's motion is determined to be proper procedurally, the Davenports contend that there is "ample" evidence to demonstrate that the activities they undertook constitute qualified research when the proper standard or regulation is applied for discovering information and internal use software.

The Davenports similarly argue that the Government's exemption argument under section 41 of the Internal Revenue Code is flawed because it applies the wrong standard or incorrectly applies the treasury regulation applicable in this case for discovering information.   The Davenports assert that the definition for discovering information contained in the regulations promulgated by the IRS in December 2003 (the "2003 Final Regulations") applies rather than the definition in the 2001 Proposed Regulations.   On the other hand, the Davenports contend that the court should apply the definition in the 2001 Final Regulations for internal use software.

The Davenports further assert that section 1.41-2(e)(2) does not require the existence of a written contract.   Finally, the Davenports contend that there is sufficient evidence to support the fixed-base percentage rate that was used to calculate the research credit claimed in the Davenports' tax returns.   Regarding the latter, the Davenports object to the deposition testimony relied on by the Government on the basis that it calls for legal conclusions.

---

[3] It appears from these arguments by the Davenports that they are confusing the parties' claims.   As reflected by the parties' pleadings, the Government's claim is based on an erroneous refund for the 2003 tax year, whereas the Davenports' claim is based on the wrongful disallowance of a refund for the 2002 tax year.   Thus, as explained herein, the Government has the ultimate burden of establishing its 2003 erroneous refund claim, not the 2002 disallowance claim.

###### B.     Qualified Research

"In an action to recover an improperly paid refund, 'the United States, as plaintiff . . ., bears

the ultimate burden of proof to show not only that some amount has been erroneously refunded but

also how much that amount is.'"   *United States v. McFerrin*, 570 F.3d 672, 675 (5th Cir. 2009)

(quoting *Soltermann v. United States*, 272 F.2d 387, 387 (9th Cir. 1959)); *see also* 26 U.S.C. § 7405.

Taxpayers must "retain records necessary to substantiate a claimed credit."   *McFerrin*, 570 F.3d at

675.  The court should, nevertheless, estimate the amount of allowable tax credit, it if determines

that some qualified expenses occurred.  *Id.*

To qualify for a credit, a taxpayer must prove that it performed "qualified research" during

the tax years at issue.  *Union Carbide Corp. and Subsidiaries v. Comm'r*, 97 T.C.M. (CCH) 1207,

*77 (2009).  To be qualified research, the research must satisfy four requirements or tests:

> (1) the expenses must be of the type deductible under I.R.C. § 174 [the section 174
> test]; (2) the research must be undertaken "for the purpose of discovering information
> . . . which is technological in nature [the technological information test]"; (3) the
> application of that information must be "intended to be useful in the development of
> a new or improved business component of the taxpayer [the business component
> test]"; and (4) substantially all of the research activities must "constitute elements of
> a process of experimentation [the process of experimentation test]."

*McFerrin*, 570 F.3d at 676; *(*quoting I.R.C. § 41(d)(1)).  The process of experimentation's

"substantially all" requirement "means that 80 percent or more of the taxpayer's research activities

for each business component, measured on a cost or other consistently applied reasonable basis, must

constitute a process of experimentation for a qualified purpose." *Union Carbide Corp. and*

*Subsidiaries*, 97 T.C.M. (CCH) at *80.

Both parties acknowledge that the court in *Union Carbide* correctly interpreted the section

174 test set forth in 26 C.F.R. § 1.174-2(a)(1)-(4) as follows:

The section 174 test requires that expenditures connected with the research activities must be eligible for treatment as expenses under section 174. Section 174 provides alternative methods of accounting for "research or experimental expenditures" that taxpayers would otherwise capitalize. The regulations define "research or experimental expenditures" as "expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense.". . . [A]n activity is "research and development . . . in the experimental or laboratory sense" if: (1) The information available to the taxpayer does not establish the capability or method for developing or improving a product or process or the appropriate design of a product or process (i.e., an uncertainty exists); and (2) the activity is intended to discover information that would eliminate this uncertainty. Because the taxpayer need only be uncertain as to 'the capability or method . . . *or* the appropriate design' of the improvement, an uncertainty may exist even if the taxpayer knows that it is technically possible to achieve a goal but is uncertain of the method or appropriate design to use to reach that goal. Whether an uncertainty exists is an objective test that depends on the information available to the taxpayer.

. . . .

The regulations under section 174 exclude expenditures for certain activities, including, as relevant here, the ordinary testing or inspection of materials, products, or processes for quality control (quality control testing). Quality control testing includes testing or inspecting to determine whether particular units of materials, products, or processes conform to specified parameters. However, quality control testing does not include testing to determine whether the design of the product or process is appropriate.

*Union Carbide Corp. and Subsidiaries*, 97 T.C.M. (CCH) at *78-79 (citations omitted and emphasis

provided by *Union Carbide Corp. and Subsidiaries*); Pl.'s Mot. 6; Defs.' Resp. 6.

The parties further agree that the definition for process of experimentation set forth in section

1.41-4(a)(5)(I) of title 26 of the Code of Federal Regulations applies in this case. *See* Pl.'s Mot. 8;

Defs.' Resp. 7. Section 1.41-4(a)(5)(I) provides:

For purposes of section 41(d) and this section, a process of experimentation is a process designed to evaluate one or more alternatives to achieve a result where the capability or the method of achieving that result, or the appropriate design of that result, *is uncertain as of the beginning of the taxpayer's research activities*. A process of experimentation must fundamentally rely on the principles of the physical or biological sciences, engineering, or computer science and involves the identification of uncertainty concerning the development or improvement of a

business component, the identification of one or more alternatives intended to eliminate that uncertainty, and the identification and the conduct of a process of evaluating the alternatives (through, for example, modeling, simulation, or a systematic trial and error methodology). A process of experimentation must be an evaluative process and generally should be capable of evaluating more than one alternative. A taxpayer may undertake a process of experimentation if there is no uncertainty concerning the taxpayer's capability or method of achieving the desired result so long as the appropriate design of the desired result is *uncertain as of the beginning of the taxpayer's research activities*. Uncertainty concerning the development or improvement of the business component (e.g., its appropriate design) does not establish that all activities undertaken to achieve that new or improved business component constitute a process of experimentation.

26 C.F.R. § 1.41-4(a)(5)(I) (emphasis added).

The parties dispute whether the Mueller software development project involved a process of experimentation, and in particular whether there was "uncertainty" as required by section 1.41-4(a)(5)(I). "The 'uncertainty' element of [the process of experimentation] test is essentially the same uncertainty as is required by the section 174 test, and the test may be satisfied even if the taxpayer is certain of either the capability or method of achieving the desired goal *if the appropriate design of the desired result is uncertain at the outset*." *Union Carbide Corp. and Subsidiaries*, 97 T.C.M. (CCH) at *80 (emphasis added). The method for discovering information under the process of experimentation test, however, is more structured than the section 174 test and does not include all actions taken by a taxpayer to resolve uncertainty. *Id.* Development of a new or improved business component is not sufficient unless it involves a process of experimentation that includes a process to evaluate one or more alternatives:

> . . . to achieve a result where the means of achieving that result is *uncertain at the outset*. This may involve developing one or more hypotheses, testing and analyzing those hypotheses (through, for example, modeling or simulation), and refining or discarding the hypotheses as part of a sequential design process to develop the overall component.

Thus, for example, costs of developing a new or improved business component are not eligible for the credit if the method of reaching the desired objective (the new or improved product characteristics) is readily discernible and applicable as of the beginning of the research activities, so that true experimentation in the scientific or laboratory sense would not have to be undertaken to develop, test, and choose among viable alternatives.

*Id.* at *80-81 (citation omitted and emphasis added). The process of experimentation test therefore "requires the use of the scientific method . . . not merely taking steps to resolve uncertainty or to improve a product." *Id.* at *81 (quoting the definition of "scientific method" set forth in Black's Law Dictionary 1373 (8th ed. 2004) as "[a]n analytical technique by which a hypothesis is formulated and then systematically tested through observation and experimentation.").

To satisfy the process of experimentation test, a hypothesis should be developed by the taxpayer "as to how a new alternative might be used to develop a business component, test that hypothesis in a scientific manner, analyze the results of the test, and then either refine the hypothesis or discard it and develop a new hypothesis and repeat the previous steps." *Union Carbide Corp. and Subsidiaries*, 97 T.C.M. (CCH) at *81. Section 1.41-4(a)(5)(I) recognizes that "systematic trial and error methodology" may be used in evaluating alternatives, but the court in *Union Carbide* explained that the use of "simple trial and error to validate that a process or product change meets the taxpayer's needs" is not sufficient. *Id.* "[S]ystematic" as used in section 1.41-4(a)(5)(I) means that:

[T]he project must involve a methodical plan involving a series of trials to test a hypothesis, analyze the data, refine the hypothesis, and retest the hypothesis so that it constitutes experimentation in the scientific sense. Testing and refining a hypothesis may involve determining the strengths and weakness of the alternative tested, whether and how the process could be further refined and improved, and whether other alternatives might be better suited for achieving the taxpayer's goal. While the process of experimentation need identify only one alternative, it generally should be capable of evaluating more than one alternative. If only one alternative is tested, for that alternative to constitute a process of experimentation the taxpayer

should conduct a series of experiments with the alternative in order to develop the business component.

. . . [E]ven if the results are not actually recorded, the taxpayer should perform a sufficient analysis of the alternative tested so that the taxpayer could meaningfully compare one alternative to another.

*Id.* at *81-82.

Section 1.41 4(b)(1) further instructs that the requirements for qualified research are applied separately to each business component.  26 C.F.R. § 1.41 4(b)(1).  Section 1.41-4(b)(2) includes a "shrinking-back rule" and explains that the requirements for qualified research are applied:

first at the level of the discrete business component, that is, the product, process, computer software, technique, formula, or invention to be held for sale, lease, or license, or used by the taxpayer in a trade or business of the taxpayer. If these requirements are not met at that level, then they apply at the most significant subset of elements of the product, process, computer software, technique, formula, or invention to be held for sale, lease, or license. This shrinking back of the product is to continue until either a subset of elements of the product that satisfies the requirements is reached, or the most basic element of the product is reached and such element fails to satisfy the test. This shrinking-back rule is applied only if a taxpayer does not satisfy the requirements of section 41(d)(1) and paragraph (a)(2) of this section with respect to the overall business component. The shrinking-back rule is not itself applied as a reason to exclude research activities from credit eligibility.

*Id.*  According to *Union Carbide*, "if a business component fails the process of experimentation because of the 'substantially all' requirement, the taxpayer may apply the shrinking-back rule [discussed in section 1.41-4(b)(2)] until an element that satisfies the test is reached." *Union Carbide Corp. and Subsidiaries*, 97 T.C.M. (CCH) at *80.

## C.    Analysis

As previously noted, to prevail on its summary judgment motion and 2003 refund claim against the Davenports, the Government must show that some amount was erroneously refunded, as well as the amount of the erroneous refund.  To establish that the refund was erroneous, the

Government has the burden of establishing that the expenses claimed by the Davenports for the 2003 tax year do not constitute qualified research under the Internal Revenue Code.  Likewise, with regard to the Davenports' wrongful disallowance claim for the 2002 tax year, the Government must show that the expenses claimed by the Davenports for 2002 do not constitute qualified research.  The Government does not have the ultimate burden of proof on the Davenports' 2002 claim.  As the summary judgment movant on the Davenports' claim, however, the Government must show that no genuine dispute of material fact exists as to whether the expenses claimed by the Davenports for 2002 constitute qualified research.  Since David and Myra Davenport contend that the Government's refund claim as to them was not timely filed, the parties both agree that the Government must also establish that its refund claim as to David and Myra Davenport was timely filed.

### 1.    The Amount Refunded by the Government for 2003

It is undisputed that for the tax year ending December 31, 2003, the Government refunded $112,399, plus $31,237.18 in interest, for a total of $143,636.18, to David and Myra Davenport for claimed research expenses related to the Mueller OneWorld Project.  The Government similarly refunded $112,398, plus $36,061.52 in interest, for a total of $148,459.52, to Morris and Cynthia Davenport for claimed research expenses related to the Mueller OneWorld Project for the tax year ending December 31, 2003.  Doc. 8 ¶¶ 22-23.  The parties dispute, however, whether the Government's erroneous refund claim with respect to David and Myra Davenport was timely filed and whether expenses claimed by the Davenports for 2002 and 2003 constitute qualified research.

### 2.    Timeliness of the Government's Refund Claim

Suits by the United States for recovery of erroneous refunds under section 7405 must be brought "within 2 years after the making of such refund."  26 U.S.C. § 6532(b).  Both parties agree

that section 6532(b) is the relevant statute for limitations purposes but disagree whether "making" a refund as that term is used in section 6532(b) refers to the date the IRS prepared and mailed the refunds at issue, or the date the United States Treasury authorized payment of the refunds.

As previously noted, the Davenports only take issue with the timeliness of the Government's refund claim as to David and Myra Davenport for the 2003 tax year. The parties acknowledge that the earliest possible date that the statute of limitations could have commenced to run is December 28, 2007, the date that the IRS prepared and mailed David and Myra Davenport's refund check for the 2003 tax year. The Davenports contend that the Government's claim accrued on December 28, 2007, and it was therefore required to file suit by December 27, 2009. The court disagrees, as this argument, if not frivolous, is certainly specious.

Rule 6(a) of the Federal Rules of Civil Procedure applies in "computing any time period specified in these rules, in any local rule or court order, or in any statute that does not specify a method of computing time." *See* Fed. R. Civ. P. 6(a). Section 6532(b) does not specify a method of computing time. For periods stated in days or a longer period of time, every day is counted, including intermediate weekends and holidays and the last day of the period; however, the day of the event that triggers the period is excluded. Fed. R. Civ. P. 6(a)(1)(A), (B). Assuming for purposes of this analysis that December 28, 2007, is the date that the Government's claim accrued, the count begins on **December 29, 2007**, not December 28, 2007, because Rule 6(a) plainly states that the first day, namely the date that triggers the event, is excluded. *Id.* Accordingly, the last day that the Government could have timely filed this action was December 28, 2009. As the Government filed this action on **December 28, 2009**, it was filed within two years after the making of the refund and is therefore timely.

**Memorandum Opinion and Order – Page 16**

Moreover, even if the court were to accept David and Myra Davenport's argument that the two years ended on December 27, 2009, the argument fails as a matter of law. Rule 6(a)(1)(C) provides that if the last day of the period for counting time falls on a "Saturday, Sunday, or legal holiday, the period continues to run until the next day that is not a Saturday, Sunday, or legal holiday."[4] Fed. R. Civ. P. 6(a)(1)(C). As December 27, 2009, fell on a Sunday, which cannot be disputed,[5] the next countable day was Monday, December 28, 2009, and the Government therefore timely filed its claim regarding David and Myra Davenport's 2003 refund. Having determined that the Government's claim was filed within the limitations period, the court need not address the parties' contentions regarding the meaning of "making" a refund. Thus, the only remaining issue is whether the Davenports were entitled to the qualified research credits claimed for expenses incurred in conjunction with the Mueller OneWorld Project in the 2002 and 2003 tax years.

### 3. Whether the 2002 and 2003 Expenses Claimed Were For Qualified Research

As previously noted, the Government asserts a number of reasons why it believes that the Davenports are not entitled to qualified research credit for the 2002 and 2003 tax years. The court, however, focuses only on the Government's argument that the activities at issue fail to satisfy the process of experimentation test since it is dispositive of the parties' claims. With regard to this issue, the Government argues as follows:

> A process of experimentation is a process designed to evaluate one or more alternatives to achieve a result where the capability or the method of achieving that result, or the appropriate design of that result, is uncertain as of the beginning of the

---

[4] The text of this rule has not changed since December 1, 2009.

[5] The court takes judicial notice of this fact pursuant to Rule 201(b)(2) of the Federal Rules of Evidence.

taxpayer's research activities.  Process of experimentation requires use of scientific method to discover information to resolve the uncertainty.

The Mueller employees' activities of requesting modifications to modules, script testing, and reporting issues with OneWorld to IBM were not a process of experimentation using the scientific method. Further, there is no evidence that the Mueller employees used a process of experimentation. To extent the Davenports claim that the Mueller employees were providing direct support to IBM's activities, IBM was not engaged in a process of experimentation because the IBM consultants had already established "the capability or the method" of achieving the necessary modifications before beginning Mueller's OneWorld project. And again, there is no evidence that IBM engaged in any process of experimentation.

Pl.'s Mot. 8-9 (citations omitted).

The Davenports acknowledge that the "process of experimentation, envisioned by Congress, requires the evaluation of alternatives via the scientific method (*i.e.*, hypothesis formation and systematic testing through observation and experimentation" and to satisfy the process of experimentation test, taxpayers must "develop a hypothesis as to how a new alternative might be used to develop a business component, test that hypothesis in a scientific manner, analyze the results of the test, and then either refine the hypothesis or discard it and develop a new hypothesis and repeat the previous steps." Defs.' Resp. 8.  The Davenports, nevertheless, contend that the Government's argument that their activities do not constitute a process of experimentation is based solely on the conclusory assertion that "[t]he Mueller employees' activities of requesting modifications to modules, script testing, and reporting issues with OneWorld to IBM were not a process of experimentation using the scientific method." *Id.* 8-9 (quoting Pl.'s Mot. 8).  The Davenports contend that this statement by the Government is factually inaccurate and oversimplifies the efforts and activities undertaken by Mueller employees and IBM in developing the Mueller OneWorld System.

**Memorandum Opinion and Order – Page 18**

The Davenports further contend that a similar argument by the Government was rejected in *Trinity Industries, Incorporated v. United States*, 691 F. Supp. 2d 688 (N.D. Tex. 2010).[6] Additionally, the Davenports maintain that the Government's argument that the Mueller employees "were engaged in testing and reporting the results of the tests to IBM for technical changes to the software package evinces a hypothesis, test, analyze, retest type process of experimentation envisioned by [the court] in *Union Carbide*." Defs.' Resp. 10-11. The Davenports therefore argue that a genuine dispute of material facts exists as to whether the research activities involved a process of experimentation under section 41(d) of the Internal Revenue Code.

The court disagrees because, as discussed in more detail herein, the evidence establishes that the testing performed by IBM and Mueller was not done to test and refine a hypothesis to determine the strengths and weakness of the alternative tested or to determine whether other alternatives might be better suited for achieving the Davenport's goal. *See* 26 C.F.R. § 1.41-4(a)(5)(I); *Union Carbide Corp. and Subsidiaries*, 97 T.C.M. (CCH) at *81. Rather, the integration and script testing performed was done *after* IBM developed or customized the Mueller OneWorld System for the purpose of validating that it worked as intended and met the business requirements of Mueller that were previously communicated to IBM. *Id.* More importantly, the evidence establishes that any uncertainty that existed as to the "capability or the method of achieving that result, or the appropriate

---

[6] In *Trinity*, the government argued that the design work involved in building the ships at issue was nothing more than ordering from a menu. The court concluded that "the simple fact that a new vessel incorporates existing systems does not resolve the QRE [qualified research expenditure] issue against Trinity. Determining the degree of QRE involved requires an examination of the overall scope of the efforts required to specify the components and integrate them into the overall design of the ship." *Trinity Indus., Inc.*, 691 F. Supp. 2d at 692. *Trinity* dealt primarily with the issue of whether the expenses claimed for specific components met the "substantially all" or 80 percent threshold requirement to meet the process of experimentation test, which is not at issue here. In any event, the court considered all evidence presented regarding the Mueller OneWorld Project and System, including evidence regarding the efforts of nonparty witness IBM and the observations of Horner, who testified regarding IBM's and Mueller's role in the Project.

design of that result" occurred during the Project, not at the outset of the Project or "as of the beginning of the [Davenports'] research activities" as required by section 1.41-4(a)(5)(I) to satisfy the process of experimentation test. *Id.*

The only evidence of whether the Mueller OneWorld Project satisfied the process of experimentation test set forth in section 1.41-4(a)(5)(I) as applied in *Union Carbide* was submitted by the Government in support of its summary judgment motion. As previously noted, the tax credits claimed by the Davenports for 2002 and 2003 are limited to expenses for employee and four contractors; however, since the Davenports contend that the Government's summary judgment motion attempts to oversimplify the efforts undertaken by Mueller employees and IBM in developing the Mueller OneWorld System, the court also reviewed the Government's evidence regarding the activities and proposals of IBM and the materials prepared by alliantgroup in 2006 in evaluating whether the employee and contractor expenses claimed by the Davenports constitute qualified research expenses.

The Government's evidence included a September 20, 2000 IBM Proposal for J.D. Edwards Design and Configuration ("Design Proposal") that was prepared for Mueller and a March 25, 2001 IBM Proposal for Mueller, Inc. Data Collection Integration to J.D. Edwards ("Data Collection Proposal"). Pl.'s App. 225-288. The September 20, 2000 cover letter from IBM explains that the Design Proposal was prepared to assist with the "design and configuration" of the JDE One World application suite and move Mueller as quickly as possible to OneWorld via a four-stage approach referred to as the "IBM J.D. Edwards Practice's Turbo BLUE Methodology" ("True Blue Methodology"). *Id.* 225. The first phase of the methodology is the "Preparation Phase," which is

used to organize the project. *Id*. The second phase is the "Redesign/Design Phase" in which the parties work together to identify and document Mueller's business requirements, needs, and processes with regard to the to-be configured software. *Id*. The third phase is the "Configuration Phase" in which IBM develops the configured software to suit Mueller's needs. *Id*. The final phase is the "Deployment Phase" in which the configured software is tested to validate that it is configured to meet Mueller's needs and operates in Mueller's production environment. *Id*.

According to the Design Proposal, the scope of this portion of the Project was intended to be limited to configuring and implementing the JDE OneWorld "with modifications to only the Sales Order Module." *Id*. 229, § 1.1; 230, § 1.3; 232; 235, § 2.2.2, ¶ 2. To minimize the amount of modification to JDE OneWorld, Mueller was expected to "modify [its] current business practices to accommodate the package functionality and thereby eliminate the need for software modification." *Id*. As part of the Project, IBM would "[d]evelop an approach for any required conversions from other Mueller [legacy] system[]s into JDE OneWorld, manual or automated." *Id*. 232. The True Blue Methodology would be used to streamline the gathering of information from Mueller regarding its business needs; "[p]roduce customized documentation of business workflows that include[s] both business process and the software procedures"; "[u]tilize ICM's JDE expertise and experience"; "[q]uickly produce significant outcomes using a result-oriented approach"; and "[f]acilitate skills transfer to Mueller's staff." *Id*. 229, § 1.2.

The Design Proposal also expands on the activities that were to take place in the four phases of the True Blue Methodology, stating that the Preparation Phase was used to organize the team, provide basic product education, and define the scope of the project, project plan, and approach to

the project. *Id*. 230, § 1.2.1. The Redesign/Design phase would allow IBM to quickly understand Mueller's current business processes and future goals that needed to be accommodated by the configured software and for the presentation by IBM of "To-Be models for [Burly or Mueller] management approval." *Id*. 230, § 1.2.2. This phase was also used "to provide a knowledge transfer opportunity for the Mueller IT staff during the installation of the OneWorld software on the enterprise database served and the deployment server." *Id*. 240, § 2.3.3.1. With regard to this phase, the Design Proposal further states:

> This phase is accelerated by the use of IBM's Standard Business Activity Model, which is validated and refined based on Mueller's business process constraints and future business goals. *Our Standard Business Activity Model combines IBM's business intelligence with industry best practices and is the basis for linking a company's business objectives to the activities which drive them and the underlying software functionality.* By graphically illustrating the relationships among a company's strategic goals, business process, and supporting software configuration, *we can clearly demonstrate how the project supports the company's strategic direction.*

*Id*. (emphasis added).

In the Configuration Phase, configuration of the software based on Mueller's customer's business needs would be completed, and workshops would be conducted to verify that the configured software met Mueller's business requirements and to resolve any remaining issues. *Id*. 230, § 1.2.3. Action labs would be used during this phase, as necessary, to "deal with a single specific, critical issue and result in a decision, not additional issues" where IBM would identify the specific issue to be resolved, review Mueller's business requirements and possible alternatives related to the issue, lead Mueller to reach a decision, update the issues database with the issue resolution, and, as necessary, ensure that Mueller executed a change authorization. *Id*. 244, §§ 2.3.4.9-2.3.4.10.

Workshops would also be conducted "to provide a knowledge transfer opportunity to Mueller's IT staff" to ensure Mueller understood what was required for the implementation, support, administration, and deployment of the system. *Id.* 243, §§ 2.3.4.5-2.3.4.7.

During the final Deployment Phase, the readiness of the configured system would be validated through the use of "test scripts." *Id.* 230, § 1.2.4; 244, § 2.3.5.1, ¶¶ 1-3. "Key Assumptions" for the JDE OneWorld phase of the Project included a determination by Mueller that "the JDE OneWorld Enterprise Software meets their business needs." *Id.* 234, § 2.2.1.5. As to the "Degree of Difficulty," IBM rated this project as being between .1 and 1, "using the scale that 1 equals a standard implementation, [and] any value less than 1 represents a simpler, less complex implementation." *Id.* 235-36.

IBM's Data Collection Proposal deals with the ERP Bridge portion of Mueller's Project. In the March 25, 2000 letter from IBM that accompanied the Data Collection Proposal to Burly, IBM expressed the opinion that its ERP Bridge data collection was the "only solution" that could meet Mueller's business needs by interfacing with JDE OneWorld without modification to Mueller's existing legacy system:

> The IBM ERPBridge data collection solution will handle your transaction requirements and address that accurate data, edited immediately at the source, updates your plant-wide JD Edwards applications as it is being transacted. The IBM Data Collection Solution for JD Edwards is uniquely architected to allow real-time 2-way communication with JD Edwards when your host is available, but also allows continued real-time operation of your plant personnel with all of the same transactions, even when your host is unavailable. The IBM data collection solution is also capable of streamlining your JD Edwards data input requirements by combining several JD Edwards transactions into one simple data collection transaction and by including logic to perform functions that may not currently be provided within standard JD Edwards applications, all without any modification to your JD Edwards environment. We believe that the IBM solution is the *only solution*

that can meet your current needs for data collection while also providing a foundation
capable of accommodating your future needs for data collection integration.

*Id*. 262-63 (emphasis added).  The purpose of the data collection portion of the OneWorld Project

was to test and implement the data collection interface between Mueller's process transactions and

JDE OneWorld, Version XE applications, at fourteen of Mueller's facilities.  *Id*. 265, § 2.1.  In

addition, the scope for this portion of the Project included IBM providing consulting assistance to

Mueller's suppliers in determining shipping barcode label practices consistent with Mueller's

receiving process.  *Id*. 266, § 2.1.  A "Key Assumption" for this portion of the Project was that

"IBM's approach is based upon using pre-existing software programs and packaged tools to be

adapted to Mueller's environment."  *Id*. 266, § 2.2.

Like the design phase applicable to JDE OneWorld, the data collection phase as to the ERP

Bridge included initial project planning and requirements identification sessions where IBM, through

the assistance of Mueller employees, gathered information to understand Mueller's business

operations and needs.  *Id*. 267, § 2.3.2; 268, § 2.3.3.  The Data Collection Proposal states: "to ensure

that the development will meet Mueller's data collection requirements," IBM will review every

Mueller transaction scenario and the objectives for each transaction and "produce a design document

defining each transaction that will be provided to deliver the functionality desired by Mueller."  *Id*.

268, § 2.3.3. Next, IBM would set-up the hardware procured by Mueller and proceed to "install and

configure [the] data collection and ERPBridge template software," with the goal of "configur[ing]

the equipment for operations and load[ing] the necessary operating system and enabling software."

*Id*. 270, §§ 2.3.5-2.3.6.

According to the Data Collection Proposal, the next stage of this process was Data Collection Transaction Development and Integration Testing, which involved developing, unit testing, and integration testing of the data collection to J.D. Edwards transactions as defined in the requirements definition session. *Id*. 271, § 2.3.8. This task included "[i]mplementation of transactions from the base templates as provided by the IBM Data Collection Solution for JD Edwards as modified to meet Mueller's [business] requirements." *Id*. The objective of this task was to "develop, test and implement the J.D. Edwards Transaction scenarios as defined in the requirements definition phase." *Id*. To accomplish this task, IBM would develop "Transaction Connection" scripts and a "Data Collection Prompting Program" for the J.D. Edwards transactions, including "error handling routines," "appropriate scripts (with automatic timers) for each download scenario, and all updates to auxiliary tables (supporting tables) on data collection PC server." *Id*.

IBM would also "[p]erform unit level testing to ensure proper fixed and RF terminal and transaction build functions," perform integration testing, review each transaction with Mueller and train designated Mueller employees on the use of each transaction, install and test the terminal transaction scripts, and reverify that the transaction data entered into the terminals are processed correctly. *Id*. In other words, IBM, during this phase, would ensure that the ERP Bridge was ready for use in Mueller's facilities or that it met the completion criteria set forth in the Data Collection Proposal. The final step in the data collection process was to roll out the software at Mueller's facilities and provide training to Mueller. *Id*. 271-272, § 2.3.9-2.3.11. For purposes of testing, Mueller was required to "provide test data, expected test results, and resources to verify test results." *Id*. 274, § 2.4.6.

The Government also submitted excerpts from the deposition testimony of Arp and Horner. Horner's testimony demonstrates that initial testing of the Mueller OneWorld System was performed by IBM to confirm everything worked "the way we intended it to work." *Id*. 13. Script testing was then performed by Mueller employees by "pretending to put in orders to . . . make sure . . . that they understood how it worked and that it actually did work and the system could handle a simulation of real production volume." *Id*. 15. According to Horner, the testing conducted by Mueller employees "probably served as training as well." *Id*. Testing also gave Mueller employees, who would be ultimately responsible for the system, an opportunity to "learn[] . . . how to look at logs in J.D. Edwards to [learn] how things were configured." *Id*. 19.

Arp similarly testified that the purpose of script testing software modules was to ensure that they worked in a test environment. *Id*. 61. Arp further testified that the reference to "reported technical issues and problems related to system" in a Wage Allocation Questionnaire completed by Mueller referred to testing by Arp and other Mueller employees, that included reporting technical issues back to IBM and "run[ning] it up the chain to get it changed." *Id*. 69, 71-72. According to Horner, IBM was the "ultimate expert" and if Mueller employees were unable during testing to figure something out or did not have the time to do so, then they turned to IBM to assist in "troubleshooting problems during script testing." *Id*. 18-19.

If Mueller employees were unhappy with the manner in which the System operated, IBM would either create "a fix" to address the issue or it would advise Mueller that the System was working as designed and Mueller would need to adjust the way in which they did their business. *Id*. 15. Likewise, if Mueller employees determined during testing that they would like the System

to have additional capabilities that were not previously discussed, such as the ability to print labels, IBM would modify the System to add the additional functionality requested. *Id*. 25. When asked if any unusual problems were experienced in Mueller's go live process, Horner testified: "[n]o, nothing unusual, just the usual things of people not understanding exactly what they should do and people finding novel ways of screwing with the system -- you weren't supposed to touch that key at that time, what were you doing that for." *Id*. 27.

Contrary to the Davenports' assertion, the court concludes, based on this testimony and the Government's other evidence, that the Government has met its summary judgment burden with regard to both parties' claims. While the Government asserts in its motion that "there is no evidence that the Mueller employees used a process of experimentation," Pl.'s Mot. 8-9, the court disagrees with the Davenport's contention that the Government's motion is an "impermissible no evidence motion without satisfying its initial burden as the movant of establishing that there is no genuine issue of material fact." Defs.' Resp. 4. Unlike the Davenports, who submitted little if any evidence, the Government submitted over 500 pages of evidence in support of its motion.[7]

The Government's evidence demonstrates that the Mueller OneWorld Project did not involve a process of experimentation or the type of systematic plan involving "a series of trials to test a

---

[7] In support of its summary judgment motion, the Government submitted a total of 451 pages of evidence, including 137 pages of deposition testimony, as follows: excerpts from Horner's and Arp's depositions; excerpts from the depositions of Bryan Davenport and Evelyn Gallant; H.R. Rep. No. 841, 99th Congress, 2d Session, September 18, 1986; IRS 2001 Proposed Regulations; Treasury Decision 8930; Announcement 2004-9; IBM Proposal for J.D. Edwards Design and Configuration, dated September 20, 2000; IBM Proposal for Mueller, Inc. Data Collection Integration to J.D. Edwards, dated March 25, 2001; Wage Allocation Questionnaire (Teresa Triplitt); Fixed Base Questionnaire; Project Descriptions; alliantgroup Proposal to Serve The Burly Corp., dated March 13, 2006; Burly Form 1120S for 2002; Burly Form 1120S for 2003; alliantgroup's 2006 Research & Development Tax Credit Study for The Burly Corp for tax years 2002 through 2003; alliantgroup's Research & Development Tax Credit Study Services; 1984 Form 1120 for Burly Fence and Hardware, Inc.; 1985 Form 1120 for Burly; and copies of relevant legislation and related IRS notices. Additional briefing requested by the court resulted in approximately 100 more pages of evidence by the parties pertaining to the timing and amount of the Government's refund to the Davenports.

hypothesis, analyze the data, refine the hypothesis, and retest the hypothesis"; nor did it involve a series of experiments with one or more alternatives to develop the Mueller OneWorld System. *Union Carbide Corp. and Subsidiaries*, 97 T.C.M. (CCH) at *81.  Instead, the evidence shows that the testing and related activities performed by IBM and Mueller were done *after* IBM finished developing or customizing the Mueller OneWorld System by modifying JDE OneWorld and ERP Bridge.  More importantly, the testing and related activities performed at this stage by IBM and Mueller was not done for purposes of identifying design alternatives but instead done to confirm or validate that the resulting System developed by IBM worked as IBM intended and met Mueller's previously identified business needs. *See id.*  As previously noted, section 1.41-4(a)(5)(I) recognizes that "systematic trial and error methodology" may be used in evaluating alternatives, but the use of "simple trial and *error to validate that a process or product change meets the taxpayer's needs*" is not sufficient.  *Id.* (emphasis added).

The evidence further establishes that IBM and Mueller believed that utilization of the JDE OneWorld application suite and IBM's ERP Bridge data collection software was the best and only solution to meet Mueller's business needs, and IBM had considerable experience in modifying JDE OneWorld and ERP Bridge to meet its customers specific business needs.  Using these platforms as a starting point, IBM used its expertise to efficiently gather information needed from Mueller about its business operations and to modify the software, primarily through configuration without consideration of other alternatives or conducting a series of experiments with one or more alternatives, to develop the design for the Mueller JDE OneWorld System and completed System before proceeding to test the System to make sure it worked as expected.

If IBM considered other alternatives or conducted experiments with one alternative in developing the Mueller JDE OneWorld System or its individual modules, such action is not supported by the record to withstand summary judgment.   Additionally, although the Project may have taken a considerable amount of man hours to complete, there is no indication that it involved anything other than a straight-forward configuration of JDE OneWorld and ERP Bridge as contemplated by IBM's proposals to Mueller.   Although IBM's Data Collection Proposal allowed for the consideration of alternatives, it only contemplated consideration of alternatives *after* IBM finished configuring the ERP Bridge and only if, during the testing and validation phase at the end of the Project, IBM or Mueller determined that a specific issue needed to be resolved to make the System operate as intended and meet Mueller's business requirements.

The Davenports dispute whether the activities of the Mueller employees and contractors satisfy the process of experimentation test.   The Davenports also contend that there is ample evidence to support their position that the activities and expenses claimed by them constitute qualified research, but they rely solely on conclusory arguments and neither offer any evidence nor cite to any evidence in the record in response to the Government's motion.   Although not required to do so, the court considered the twelve pages of deposition testimony submitted by the Davenports in support of their Motion for Partial Summary Judgment.   While their motion dealt solely with the issue of the legal standards applicable to the tests for "discovery" and "internal use software," the Davenports also contend in conclusory fashion that, for multiple reasons, "it became necessary for Mueller to conduct extensive software development expanding the capabilities of the software suite purchased from IBM."   Defs.' Mot. 8.   The Davenports go on to state in their motion that:

> Throughout the development of ONE WORLD, Mueller employees were engaged in meetings and discussions regarding all aspects of the system.  In addition, Mueller created a "war room" where continual meetings occurred daily.  Throughout the tax years at issue, Mueller employees were consistently engaged in testing and analysis of all code modules developed.  Mueller employees were responsible for testing all code developed, for example, to analyze the effect of code modification and evaluate the throughout or connectivity of the system.

*Id.*  For support, the Davenports cite to page 124, line 23 through page 125, line 20 of Bryan Davenport's deposition testimony.  On page 124 of his deposition, Bryan Davenport states in conclusory fashion: "My involvement was extensive, from exploration, determining the    the strategy for developing this integration software.  Like I said, whether we're going . . . ." Defs.' App. 5.  Page 125 of Bryan Davenport's deposition is not included in the Davenport's appendix.[8] The following page of the Davenport's appendix starts with page 127 of Bryan Davenport's deposition, which deals with pre-2002 activities that are not relevant to the court's analysis of whether the Mueller's and IBM's activities in 2002 and 2003 constitute a process of experimentation.  *See* Defs.' App. 6.

The Davenports also cite to the deposition of Arp, who testified that software referred to as MIRA was developed internally by Mueller using consultant Shannon Bailey.  According to Arp, MIRA fell "under the big umbrella of OneWorld" and was built for the purpose of designing metal roofs that was tied to and fed all requirements needed for the design of a metal roof, including raw materials, into the Mueller OneWorld System.  Defs.' App. 10-12.  No other information or details about the development of MIRA are provided.  Arp testified that Rayome Soupiset ("Soupiset")

---

[8] The Davenports' appendix is sequentially numbered with handwritten page numbers 2 through 13 appearing at the bottom right corner of each page, with the first page being the index of the appendix.  Thus, this portion of Bryan Davenport's deposition appears to have been intentionally deleted or omitted.

would be the proper person to question regarding MIRA; however, no evidence regarding MIRA or Soupiset's knowledge of MIRA is included in the record.

The deposition testimony of Bryan Davenport and Arp is insufficient to raise a dispute of material fact as to whether the claimed expenditures for the activities of the Mueller employees and contractors satisfy the process of experimentation test. Moreover, even if the court were to accept as true the Davenports' conclusory assertion that Mueller employees and contractors "were engaged in testing and reporting the results of the tests to IBM for technical changes to the software package evinces a hypothesis, test, analyze, retest type process of experimentation envisioned by [the court] in *Union Carbide*," Defs.' Resp. 10-11, the court determines, based on the evidence submitted by the Government, that the activities undertaken by the Mueller employees and contractors still fail to satisfy the process of experimentation test because, as previously noted, the evidence establishes that any uncertainty that existed as to the "capability or the method of achieving that result, or the appropriate design of that result" occurred only during the Project, not at the outset of the Project or "as of the beginning of the [Davenports'] research activities" as required by section 1.41-4(a)(5)(I) to satisfy the process of experimentation test. *See* 26 C.F.R. § 1.41-4(a)(5)(I); *Union Carbide Corp. and Subsidiaries*, 97 T.C.M. (CCH) at *81.

The only evidence in the record that the court was able to locate that refers specifically to uncertainty is a November 30, 2007 statement by Soupiset that appears to have been prepared by alliantgroup to support the Davenports' amended tax returns. According to Soupiset's statement, "[t]he Company encountered numerous technical uncertainties *during the development of the One World system*" and "[b]ecause Burly faced substantial technical uncertainty *during the course of this*

*project* regarding capability, feasibility, and method, this project meets the requirements of the technical uncertainty test." Pl.'s App. 292 (emphasis added). While the parties dispute which standard should be applied with regard to the discovery test, they acknowledge that uncertainty must exist at the "outset" of the development process. *See* Defs.' Resp. 6, 8. Accepting Soupiset's statement as true, this evidence further supports the Government's argument that the expenses claimed by the Davenports for 2002 and 2003 do not meet the process of experimentation test and therefore do not constitute qualified research expenditures.

The court also reviewed alliantgroup's March 2006 study and summary of the work performed by four contractors and Mueller employees in conjunction with the Mueller OneWorld Project, which similarly reflects that uncertainty, if any, was not encountered by Mueller until after the initial development of the System by IBM, while testing to confirm that the System operated as intended and met Mueller's business needs. Pl.'s App. 362-66. As a result, the testing and related modifications, as described by alliantgroup, do not satisfy the requirement that uncertainty exist at the "outset" or "as of the beginning of the taxpayer's research activities" as required by the process of experimentation test. 26 C.F.R. § 1.41-4(a)(5)(i) (emphasis added); *Union Carbide Corp. and Subsidiaries*, 97 T.C.M. (CCH) at *80. The court's conclusion in this regard is further supported by IBM's proposals and the deposition testimony of Horner and Arp. Accordingly, the court determines, based on the record as a whole, that no genuine dispute of material fact exists as to whether Mueller's OneWorld Project and the related activities that took place in 2002 and 2003 constitute a process of experimentation as required for qualified research credit. Stated another way, the Government is entitled to judgment on both claims because: (1) the integration and script testing

performed was done *after* IBM developed or customized the Mueller OneWorld System for the purpose of validating that it worked as intended and met the business requirements of Mueller that were previously communicated to IBM; and (2) any uncertainty that existed as to the "capability or the method of achieving that result, or the appropriate design of that result" occurred *during* the Project, not at the outset or beginning of the Project and the Davenports' research activities as required by section 1.41-4(a)(5)(I) to satisfy the process of experimentation test.  Further, the Davenports presented no evidence that raises a dispute of material fact as to these issues.

       As previously noted, the taxpayer may apply the shrinking-back rule discussed in section 1.41-4(b)(2) until an element of the newly developed business component satisfies the process of experimentation test.  The court has determined that none of the expenses claimed by the Davenports constitutes qualified research.  Moreover,  even if the court had concluded that some of the expenses claimed by the Davenports were for qualified research, the Davenports offered no argument or evidence of the costs associated with any subset of the Mueller OneWorld Project or Mueller OneWorld System that pertains to the expenses claimed.  As a result, there is no evidence from which the court could make a determination in this regard or estimate qualified research expenditures relating to any business component smaller than the Mueller OneWorld System.  *See Trinity Indus., Inc.*, 691 F. Supp. 2d at 693 (noting that *McFerrin* requires courts to estimate the allowable tax credit if the taxpayer can establish that some qualified expenses occurred, but determining that such an estimation could not be made because there was "no evidence from which [the court could] estimate QREs relating to any business component smaller than an entire vessel.").

Having determined that the Mueller employee and contractor expenses fail to satisfy the process of experimentation test, the court need not address the parties' other arguments. Accordingly, the court concludes, based on the record before it, that the Government is entitled to summary judgment on its claim to recover the erroneous refunds issued to the Davenports for the 2003 tax year and the Davenports' claim that the IRS wrongfully disallowed tax credits for qualified research for the 2002 tax year.

### 4.    The Davenports' Objections to Deposition Testimony

The Davenports object to testimony relied on by the Government regarding the fixed-base percentage rate that was used to calculate the Davenports' research credit. The court determined that the Government was entitled to summary judgment on other grounds and did not consider this testimony in deciding the Government's summary judgment motion. The court therefore **overrules as moot** these objections.

## IV.    The Davenports' Partial Summary Judgment Motion

The Davenports moved for partial summary judgment, seeking a determination regarding a "purely legal issue" as to the standard or standards that govern the parties' claims. Specifically, the Davenports contend that the 2003 Final Regulations' definition of "discovery" and the 2001 Final Regulations' definition of "internal use software" should apply. Defs.' Mot. 6. In support of their motion, the Davenports submitted twelve pages of deposition testimony of Arp and Morris B. Davenport.[9] It is unclear to the court why the Davenports presented evidence in support of their

---

[9] The Davenports' motion cites to the "Deposition of Bryan Davenport," although only the deposition of Morris B. Davenport was submitted in support of Davenport's motion. The Government also submitted and relies on portions of Morris B. Davenport's deposition testimony, but it refers to this testimony in its appendix as "Excerpts from the deposition of Bryan Davenport." The court therefore concludes that the parties' citations to Bryan Davenport's testimony

motion that raises only the aforementioned legal issues.   In any event, because the court has determined, based on other grounds, that the Davenports are not entitled to research credit for the Mueller OneWorld Project expenses claimed for the 2002 or 2003 tax years, it need not address the issues raised in the Defendants' Partial Summary Judgment Motion regarding the legal standards applicable to discovery and internal use software.   Moreover, the court's opinion is based on law and standards not disputed by the parties.   Further, granting summary judgment on behalf of the Davenports would conflict with the legal determinations already made regarding the Government's summary judgment motion.   Accordingly, the court **denies** Defendants' Motion for Partial Summary Judgment.

## V.      Miscellany - Parties' Appendices

The court notes that although both parties' summary judgment appendices are numbered in accordance with Local Rule 7.1, neither party cited to the page numbers of the appendices as required by Local Rule 7.2(e), and instead cited to miscellaneous exhibit numbers, deposition pages, and bates numbers of documents produced during discovery, some of which no longer appear on evidence as submitted.   This approach not only defeated the purpose of numbering the pages of the appendices, but also made it excruciatingly difficult and time-consuming for the court to locate cited evidence in the record, which consists of approximately 500 pages of materials.   To avoid delay, the court did not require the parties to revise and resubmit their briefing with appropriate citations to the record; however, **the court admonishes the parties that any future briefing in this case must**

---

is actually intended to refer to the deposition testimony of Morris B. Davenport, whose middle name is presumably Bryan.

**conform with the court's local rules and deficient submissions will be unfiled by the clerk of the court upon instruction by the court.**

## VI.     Conclusion

For the reasons discussed herein, the court concludes that no genuine dispute of material fact exists regarding the Government's 2003 refund claim or the Davenports' 2002 qualified research credit claim under the Internal Revenue Code, and the Government is entitled to judgment as a matter of law. Accordingly, the court **grants** the United States' Motion for Summary Judgment, **denies** Defendants' Motion for Partial Summary Judgment, and **dismisses with prejudice** the Davenports' claims. The court will enter a judgment in favor of the Government as to both parties' claims by separate document pursuant to Rule 58 of the Federal Rules of Civil Procedure.

The Government contends that it is entitled to attorney's fees and costs incurred, together with interest and a ten percent surcharge on the amount recovered in this action. The court will consider the Government's request for attorney's fees postjudgment pursuant to Federal Rule of Civil Procedure 54(d). Additionally, the court desires briefing regarding the Government's request for recovery of a ten percent surcharge under 28 U.S.C. § 3011 and interest under 26 U.S.C. §§ 6602, 6621 and 28 U.S.C. § 1961(c)(1), including the calculation and total amount of the surcharge sought, the rate of prejudgment interest, the date that prejudgment interest accrues, and calculation of the total amount of interest. Accordingly, the Government shall file a supplemental brief **not to exceed 10 pages by September 28, 2012.** Likewise, the Davenports may file a brief stating whether the Government is entitled to prejudgment interest and a ten percent surcharge. Such brief shall **not exceed 10 pages and must also be filed by September 28, 2012.** Both parties' briefs must include

appropriate citations to applicable law and, if necessary, evidence.  If evidence is included, it does not count as part of the ten-page limitation; **however, the parties are strongly cautioned to include only evidence that is apposite and to not unduly burden the record**.

As all substantive issues have been decided on the merits, and the only remaining matters are those relating to what relief should be included in the judgment and the issue of attorney's fees. Therefore, the court **directs** the clerk of the court to administratively close this action and send the appropriate form indicating such closure to the Administrative Office.[10]

**It is so ordered** this 14th day of September, 2012.

Sam A. Lindsay
United States District Judge

---

[10] The administrative closure of this case for statistical purposes is simply a docket-management device.  As such, it not a final judgment and does not affect the parties' rights.

**Memorandum Opinion and Order – Page 37**